

ORIGINAL

1   GERGOSIAN & GRALEWSKI LLP
    EDWARD M. GERGOSIAN (105679)
2   ROBERT J. GRALEWSKI, JR. (196410)
    550 West C Street, Suite 1600
3   San Diego, CA  92101
    Telephone: (619) 230-0104
4   Facsimile: (619) 338-1139

5   Attorneys for Plaintiffs

6

7                   UNITED STATES DISTRICT COURT

8                  CENTRAL DISTRICT OF CALIFORNIA

9   KATHERINE G. POTTER; and
    CHARLES B. KRIEGER, PhD                    04   10507 GPS
10
                  Plaintiffs,                                    JWJx
11
          v                                    JURY TRIAL DEMANDED
12
    B. WAYNE HUGHES; B. WAYNE                  DERIVATIVE COMPLAINT FOR
13  HUGHES, JR; TAMARA HUGHES                  BREACH OF FIDUCIARY DUTY,
    GUSTAVSON; DANN V.                         WASTE   OF   CORPORATE
14  ANGELOFF; MARVIN M. LOTZ;                  ASSETS,   VIOLATION   OF
    HARVEY LENKIN; RONALD L.                   CALIFORNIA  CORPORATIONS
15  HAVNER, JR.; THOMAS J.                     CODE     SECTION    25402,
    BARRACK, JR.; ROBERT J.                    MISAPPROPRIATION    OF
16  ABERNETHY; WILLIAM C.                      CORPORATE  INFORMATION,
    BAKER; URI P. HARKHAM;                     AIDING    AND   ABETTING
17  DANIEL C. STATON; JOHN T.                  BREACH   OF   FIDUCIARY
    EVANS; JOHN REYES; DAVID                   DUTIES, ABUSE OF CONTROL,
18  GOLDBERG; A. TIMOTHY                       GROSS   MISMANAGEMENT,
    SCOTT; and Does 1 through 100,             CONSTRUCTIVE FRAUD, AND
19  inclusive,                                 UNJUST ENRICHMENT

20                Defendants.

21  and                                        FILE BY FAX

22
    PUBLIC STORAGE INC., a
23  California Corporation,

24                Nominal Defendant.           DOCKETED ON CM

25                                                  JAN - 6 2005
26
27
28                                                                  COMPLAINT
                                                                    Case No.:

JAN · 5 2005

12/30/2004 11:54:51 am  clor  9L a? r:b8
        Cashier : Sherron  I C. r-ti
Paid by: nance t al P Jonebi
c:0v81-18t4/
2885-086984        5 - Filing for (dver:.'?
Amount 1                        L05::
c:0v04-18-8/
2885-018648        11 - Suicide: fan: tr:( )
Amount 1                        5 5.00
Check Payment : 00-" 7          45.00
Total Payment :                   0.00

# DERIVATIVE COMPLAINT

Plaintiff Katherine G. Potter ("Potter"), and Plaintiff Charles B. Krieger, PhD ("Krieger") collectively Plaintiffs, by their undersigned attorneys, bring the following stockholder's derivative Complaint on behalf of nominal defendant Public Storage, Inc. ("PSI" or the "Company"). Plaintiffs' complaint is based upon personal knowledge as to their own acts and, as to all other matters, upon the investigation made by and through their counsel, and asserts claims against B. Wayne Hughes ("Hughes"), B. Wayne Hughes, Jr. ("Hughes Jr."), Tamara Hughes Gustavson (" Tamara Hughes"), collectively ("Hughes Family Defendants"); Ronald L. Havner, Jr.("Havner"), Marvin M. Lotz ("Lotz"), Harvey Lenkin ("Lenkin"), collectively ("Management/Director Defendants") ; David Goldberg ("Goldberg"), John Reyes ("Reyes"), A. Timothy Scott ("Scott"), collectively ("Management Defendants"); and Dann V. Angeloff ("Angeloff"), Robert J. Abernethy (" Abernethy"), William C. Baker ("Baker"), Thomas J. Barrack, Jr. ("Barrack"), Uri P. Harkham ("Harkham"), Daniel C. Staton ("Staton"), and John T. Evans ("Evans") collectively ("Independent Director Defendants"). As used herein, "Director Defendants" refers to all individual defendants who during relevant time periods were members of PSI's Board of Directors and "Individual Defendants" refers to all individual defendants. PSI is a Nominal Defendant herein and no claims have been asserted against it.

The investigation by plaintiffs' counsel included a review of: PSI's filings from February 1995 to the present with the United States Securities and Exchange Commission ("SEC"), press releases issued and other public statements made by the Company; extensive correspondence from June 6, 2002 to the present related to a shareholder demand served upon PSI's Board of Directors on November 25, 2002 by PSI shareholder and plaintiff Krieger, collectively ("the Krieger Demand"), and the actions taken by the Director Defendants in response thereto; securities analysts' reports and advisories about the Company; and court files,

1  news articles, and other reports concerning the Company and other reports
2  concerning other companies with which members of PSI's Board of Directors
3  were or are affiliated. Based upon the foregoing, Plaintiffs complain and allege as
4  follows:

5  ## NATURE OF THE ACTION

6  1.     This is an action to recover an amount in excess of several hundred
7  millions of dollars that PSI's controlling shareholders, the Hughes Family
8  Defendants, improperly took from PSI through a series of various unjust,
9  unreasonable, and abusive related party transactions ("the related party
10 transactions"). The related party transactions were based upon and supported by
11 the issuance of false or misleading information in various PSI public disclosures
12 to its shareholders, or the omission of material disclosures related to these
13 transactions, all in violation of federal law and regulations, including violations of
14 the Sarbanes-Oxley Act of 2002, and aided and abetted by the grossly negligent or
15 complicit conduct of the Director Defendants who breached their fiduciary duties
16 of candor, care, good faith, loyalty and full disclosure to PSI and its shareholders.

17 2.     This shareholder derivative action is brought on behalf of nominal
18 defendant PSI (a California corporation publicly traded on the New York Stock
19 Exchange ("NYSE")) pursuant to Rule 23.1 of the Federal Rules of Civil
20 Procedure, state and common law, against the Hughes Family Defendants and
21 certain present or former directors or executive officers of the Company, and
22 seeks to remedy defendants' ongoing and continuing violations of law, including
23 wrongful refusal of demands by PSI shareholders, breaches of the fiduciary duties
24 of candor, care, good faith, loyalty and full disclosure; gross negligence and
25 mismanagement; fraudulent waste of corporate assets; abuse of control; and
26 failure to disclose material information to PSI's public shareholders, including
27 misrepresentations made in or omissions from public disclosures, all in violation
28 of federal law, including the Sarbanes–Oxley Act.

COMPLAINT
Case No:

1    3.    In addition, plaintiffs allege that the Director Defendants, and
2    Defendants Hughes, Hughes Jr,, Lotz, Lenkin, Goldberg and Havner caused PSI
3    to issue the 1995, 2000 and 2001 proxy statements that were materially
4    misleading concerning the operations of PS Insurance Company, Ltd. ("PSIC") at
5    November 13, 1995 and the acquisition by PSI of PSIC from the Hughes Family
6    Defendants on December 31, 2001.  In addition, proxy statements and other public
7    filings by PSI issued between 1996 and 2002 failed to disclose that PSI was
8    providing valuable services to Canadian entities, owned in whole or in part and
9    controlled by the Hughes Family Defendants, and received grossly inadequate, or,
10   even more likely no, compensation for the fair value thereof. Plaintiffs allege that
11   the materially misleading statements and omissions were fraudulent in nature and
12   intended to mislead and deceive PSI's public shareholders.

13   4.    The Hughes Family Defendants' misconduct alleged in this
14   complaint includes three categories of transactions, collectively ("the abusive
15   related party transactions").

16   5.    The first category involves transactions related to the operations of
17   PSIC and its subsequent sale to PSI on December 31, 2001 and includes (1) the
18   unjust and uncompensated seizure, sometime prior to 1995, of a valuable
19   corporate opportunity from PSI and its shareholders by the Hughes family through
20   their ownership of PSIC;  (2) the subsequent undisclosed use of valuable PSI
21   resources by PSIC, without compensation to PSI, from before 1995 through 2001,
22   to conduct and operate the seized business opportunity; (3) the benefits of six
23   years (1996 through 2001) of PSIC's profits from the seized corporate opportunity
24   by the Hughes Family Defendants, which should have gone to PSI; and (4) the
25   subsequent sale of PSIC (in essence the outrageous sale of the business
26   opportunity previously seized by the Hughes Family)  to PSI, on December 31,
27   2001, at a fraudulent, unjust and unreasonable price to PSI.

28

1    6.    Collectively, the PSIC related party transactions ("the PSIC Scheme
2    or PSIC Transactions") resulted in the unjust and unreasonable transfer of wealth,
3    estimated to be in the region of $160 million, from PSI to the Hughes Family
4    Defendants.

5    7.    The second set of transactions involves the uncompensated or, at
6    best, inadequately compensated use of PSI resources, including senior
7    management personnel and other services furnished by PSI to certain Canadian
8    entities ("the Canadian properties"), including Public Storage Canadian Properties
9    ("PSCP"), a Canadian public limited partnership, owned, in whole or in part, and
10    controlled by the Hughes family, collectively ("the Canadian transactions").

11    8.    PSI has no economic interest in the Canadian properties and no
12    contractual agreement to provide services to the Canadian properties has ever
13    been disclosed by PSI.

14    9.    Prior to December 31, 2003, all, or most all, of the Canadian limited
15    partnership's officers, none of whom were employees of the Canadian partnership,
16    were senior officers and employees of PSI who paid their salaries and expenses.

17    10.    In 2003, PSI suddenly and belatedly acknowledged, as a consequence
18    of the assertions in the Krieger Demand, that there had been "conflicts of interest"
19    involved in the allocation of costs to the Canadian properties and that PSI was not
20    reimbursed for the full fair value of the services provided to the Hughes Family
21    owned Canadian properties.

22    11.    PSI has failed to disclose information concerning whether or not any
23    reimbursement was obtained for the fair value of such services for the years 1996
24    through 2002. However, it is likely that PSI was not compensated for its services
25    during 1996 through 2002 or, at best, was inadequately compensated for such
26    services.

27    12.    Due to this failure to disclose information about the Canadian
28    transactions it is not currently possible to accurately calculate the unreimbursed

COMPLAINT
Case No:

1  benefit received by the Hughes Family Defendants, but it is estimated to be at
2  least in the region of $10 million.

3      13.    The third category of transactions involves grossly excessive and
4  unjustifiable management and advisory fees ("the M & A Transactions") paid by
5  PSI to entities owned by the Hughes Family Defendants.

6      14.    While the Hughes Family defendants knew the amounts extracted
7  from PSI by M & A Transactions were far in excess of the cost or the value of
8  such services, PSI's public shareholders did not. They had no way of knowing
9  because the hugely excessive profits to the Hughes Family Defendants resulting
10  from M & A Transactions were never reported to them in PSI's annual reports to
11  shareholders or its Annual Report to the Securities and Exchange Commission on
12  Form 10-K.

13      15.    For example, in the only year for which information is publicly
14  available concerning the costs incurred related to the M & A Transactions, the
15  Hughes Family Defendants received $30 million from PSI and reported only $6
16  million in related costs, providing the Hughes Family Defendants an unjust and
17  unreasonable profit of over $24 million, or a net profit rate before taxes of 80%!

18      16.    While the total monetary and economic detriment to PSI and its
19  public shareholders due to the M & A Transactions is not presently calculable by
20  Plaintiffs, it could well exceed several hundred millions of dollars.

21      17.    At the time of the 1995 merger between PSI's predecessor, Storage
22  Equities, Inc. ("SEI") and certain companies and properties owned by the Hughes
23  Family Defendants, the value of the unjust and unreasonable management and
24  advisory fees was capitalized by valuing the fees and paying for their then present
25  value in PSI stock. Thus the Hughes family has improperly enjoyed dividends
26  and increases in market value of the excessive PSI stock from the time of the 1995
27  merger to the present, in this way perpetuating the frauds.

28

---

5

18. Insufficient information is publicly available for plaintiffs to accurately estimate the total damages associated with the excessive fees, but it appears that 80% or more of the stock the Hughes family improperly received from their M&A Transactions was attributable to the excessive fees. This being the case, the damages would range from several hundred million dollars to one billion dollars or more.

19. From sometime before 1995 and continuing to the present, the Hughes Family Defendants and the Management Defendants breached their fiduciary duties of care, good faith, loyalty and full disclosure by their participation in the abusive related party transactions which fraudulently diverted at least hundreds of millions of dollars to the Hughes Family Defendants, and which was disguised and aided and abetted by the preparation and dissemination of materially false and misleading information, or the omission of material information, in filings with the SEC from at least October 1995 and continuing to the present.

20. From sometime before 1995 and continuing to the present, the Director Defendants breached their fiduciary duties of care, loyalty, and full disclosure and were grossly negligent, or complicit, in approving the abusive related party transactions. Had the Defendant Directors exercised care, they would not have approved these transactions and PSI's corporate assets would have been preserved, not fraudulently wasted.

21. The Hughes Defendants and Management Defendants in furtherance of the PSIC Scheme have placed in jeopardy PSI's election to be treated as a Real Estate Investment Trust ("REIT") for federal income tax purposes, thereby exposing PSI to unrecognized and unreported income tax liabilities of hundreds of millions of dollars.

22. A Special Committee of PSI's independent directors was formed in December 2002 ("the Special Committee") for the announced purpose of

6

COMPLAINT
Case No:

1  investigating the Krieger Demand.  After a period of two full years, the Special
2  Committee has made no public disclosure or report to PSI's shareholders or the
3  public of any sort regarding their investigation, its scope, findings and
4  conclusions, and the actions undertaken on behalf of PSI to meet the Krieger
5  demand.

6      23.   Defendant Hughes and the Audit Committee and Nominating/
7  Corporate Governance Committees of PSI have been provided specific
8  information regarding possible contracting irregularities that involve waste of
9  PSI'S corporate assets, management conflicts of interests and unreported financial
10  benefits received by related parties. The Committees have not replied to the
11  demand to investigate these matters. As far is as known by Plaintiffs, no
12  investigation of the information that was provided has been performed or
13  commenced.  Subsequent to the delivery, on November 25, 2002, of the Krieger
14  Demand, the Independent Directors and Management Defendants have conspired
15  and cooperated with the Hughes Family Defendants in an attempt to entirely
16  frustrate or minimize, to the maximum extent possible, the recovery demanded on
17  behalf of PSI from the Hughes Family Defendants.

18                    **JURISDICTION AND VENUE**

19      24.   PSI is incorporated in California and maintains its headquarters in
20  Glendale, CA.  PSI's stock is listed and traded on the NYSE and the Pacific
21  Exchange.  PSI files periodic reports with, and is subject to, the jurisdiction of the
22  SEC and thus federal law.

23      25.   This suit is brought here, in part, due to the involvement of violations
24  of federal law in this case, including the Sarbanes-Oxley Act.

25      26.   PSI, its officers and directors are subject to federal law and the
26  unique requirements of the Sarbanes-Oxley Act, which was enacted by the U.S.
27  Congress in 2002 to try to halt, deter, identify and provide sanctions for the kind
28  of corporate misconduct alleged herein.

COMPLAINT
Case No:

1

**THE PARTIES**

2      27.    Nominal defendant PSI is, and at all times relevant herein was, a
3  corporation, organized and existing under the laws of the state of California. The
4  Corporation is publicly held and its common and preferred stock trades on the
5  New York Stock Exchange.

6      28.    Plaintiff Potter is, and at all times relevant herein was, an individual,
7  holding publicly traded stock in PSI. Plaintiff Potter asserts this derivative suit on
8  behalf of PSI.

9      29.    Plaintiff Krieger is, and at all times relative herein was, an individual,
10  holding publicly traded stock in PSI for the years 2002 to the present.    Plaintiff
11  Krieger asserts this derivative suit on behalf of PSI.

12      30.    Defendant Hughes is, and at all times relevant herein was, an
13  individual and a resident of Los Angeles County, State of California, and the
14  Chairman of the Board of Directors of PSI. He has been a director of PSI since its
15  organization in 1980 and was President and Co-Chief Executive Officer from
16  1980 until November 1991 when he became Chairman of the Board and sole
17  Chief Executive Officer. Hughes retired as Chief Executive Officer in November
18  2002 and remains Chairman of the Board. He was Chairman of the Board and
19  Chief Executive Officer from 1990 until March 1998 of Public Storage Properties
20  XI, Inc., which was renamed PS Business Parks, Inc. ("PSB"), an affiliated REIT.
21  From 1989-90 until the respective dates of merger, he was Chairman of the Board
22  and Chief Executive Officer of 18 affiliated REITs that were merged into PSI
23  between September 1994 and May 1998 (collectively, "the Merged Public Storage
24  REITs"). Hughes has been active in the real estate investment field for over 30
25  years. He is the father of Defendant Hughes Jr., a member of PSI's Board and of
26  Defendant Tamara Hughes, a former executive of the Company.  Hughes is a
27  trustee of the University of Southern California.

28

---

8                                                          COMPANY
                                                           COMPLAINT
                                                           Case No:

1       31.   Defendant Hughes Jr. is, and at all times relevant herein was, an

2   individual and a resident of Los Angeles County, State of California, and a

3   director and Vice President – Acquisitions of PSI. He is the son of Defendant

4   Hughes. Hughes Jr. became a director of the PSI in January 1998. He was

5   employed by PSI from 1989 to 2002 serving as Vice President - Acquisitions of

6   the PSI from 1992 to 2002. Hughes Jr. is the president of Sweet Blessings LLC, a

7   firm that manufactures and distributes sweets.

8       32.   Defendant Tamara Hughes is, and at all times relevant herein was, an

9   individual and a resident of Los Angeles County, State of California, and was

10  Vice President - Administration of PSI until 2002. She is the daughter of

11  Defendant Hughes.

12      33.   Defendant Havner is, and at all times relevant herein was, an

13  individual and a resident of Los Angeles County, State of California, and was

14  elected Vice-Chairman, Chief Executive Officer and a director of PSI in

15  November 2002. Havner has been Chairman of PSB from March 1998 to the

16  present, Chief Executive Officer of PSB from March 1998 until August 2003 and

17  President of PSB from March 1998 to September 2002. From December 1996

18  until March 1998, he was Chairman, President and Chief Executive Officer of

19  American Office Park Properties, Inc., a predecessor of PSB. He was Senior Vice

20  President and Chief Financial Officer of PSI and Vice President of PSB and

21  certain other REITs affiliated with the Company from November 1991 until

22  December 1996. Havner became an officer of the PSI in 1986, prior to which he

23  was in the audit practice of Arthur Andersen & Company. He is a member of the

24  National Association of Real Estate Investment Trusts, Inc. (NAREIT) and the

25  Urban Land Institute (ULI) and a director of PSB, Business Machine Security,

26  Inc. and The Mobile Storage Group.

27      34.   Defendant Angeloff is, and at all times relevant herein was, an

28  individual and a resident of Los Angeles County, State of California, and a

---

9

COMPLAINT
Case No:

1   director of PSI since its organization in 1980.   Angeloff, Chairman of the
2   Nominating/Corporate   Governance   Committee   and   a   member   of   the
3   Compensation Committee, has been President of the Angeloff Company, a
4   corporate financial advisory firm, since 1976.  Angeloff is the general partner of a
5   limited partnership that in 1974 purchased a mini-warehouse operated by PSI.  He
6   is a director of Bjurman, Barry Fund, Inc., Nicholas/Applegate Fund, ReadyPac
7   Produce, Inc., Retirement Capital Group and Soft Brands, Inc. He was a director
8   of SPI from 1989 until June 1996 and is a director of Aremissoft Corporation.

9       35.   Defendant Lotz is, and at all times relevant herein was, an individual
10  and a resident of Los Angeles County, State of California, and a director and a
11  Senior Vice President of the Company until March 2004 when he terminated his
12  employment with the Company. The Company paid Lotz $600,000 at the time of
13  the termination of his employment.

14      36.   Defendant Lenkin is, and at all times relevant herein was, an
15  individual and a resident of Los Angeles County, State of California, and a
16  director and the President of the Company since November 1991. Lenkin has been
17  employed by PSI or its predecessor, an entity controlled by the Hughes Family
18  Defendants, for over 25 years. He has been a director of PSB since March 1998
19  and was President of PSB from 1990 until March 1998. Lenkin was President of
20  the merged Public Storage REITs from 1989-90 until the respective dates of
21  merger and was also a director of one of those REITs, Storage Properties, Inc.
22  ("SPI"), from 1989 until June 1996. He is a director of Paladin Realty Income
23  Properties I, Inc. and a member of the Executive Committee of the Board of
24  Governors of the National Association of Real Estate Investment Trusts, Inc.
25  (NAREIT).

26      37.   Defendant Barrack is, and at all times relevant herein was, an
27  individual and a resident of Los Angeles County State of California, and was
28

---

10

1   director of the Company from 1998 until May 2003 when he did not stand for
2   reelection.

3       38.     Defendant Evans is and at all times relevant herein was an individual
4   and a resident of Toronto, Canada.  Evans is a member of the Audit Committee,
5   and became a director of the Company in August 2003. Evans has been a partner
6   in the law firm of Osler, Hoskin & Harcourt LLP, Toronto, Canada from April
7   1993 to the present and in the law firm of Blake, Cassels & Graydon LLP,
8   Toronto, Canada from April 1966 to April 1993. Mr. Evans specializes in business
9   law matters, securities, restructurings, mergers and acquisitions and advising on
10  corporate governance. Evans is a director of Cara Operations Inc. and Kubota
11  Metal Corporation. Until August 2003, Mr. Evans was a director of Canadian
12  Mine-Warehouse Properties Ltd., a Canadian corporation owned by the Hughes
13  Family Defendants.

14      39.     Defendant Abernethy is, and at all times relevant herein was, an
15  individual and a resident of Los Angeles County, State of California, and a
16  director of PSI since its organization in 1980. Abernethy, Chairman of the Audit
17  Committee and a member of the Compensation Committee, has been President of
18  American Standard Development Company and of Self-Storage Management
19  Company, which develop and operate mini-warehouses, since 1976 and 1977,
20  respectively. Abernethy was controller of a division of Hughes Aircraft from 1972
21  to 1974. He is a member of the board of trustees of Johns Hopkins University, a
22  director of the Los Angeles Music Center, a member of the Board of Overseers of
23  the Los Angeles Philharmonic, a trustee of Loyola Marymount University, a
24  director of the Pacific Council on International Policy, a director of the Atlantic
25  Council, a member of the Council on Foreign Relations and a former California
26  Transportation Commissioner. Abernethy is a former member of the board of
27  directors of the Los Angeles County Metropolitan Transportation Authority and of
28  the Metropolitan Water District of Southern California, a former member of the

No.7189   P. 17          1668-644 (916) EDIMNOITAN TZI   MA00:8  4002 .92 .geD

1 California State Board of Education, a former member of the California State Arts
2 Council, a former Planning Commissioner, a former Telecommunications
3 Commissioner and the former Vice-Chairman of the Economic Development
4 Commission of the City of Los Angeles. He received an M.B.A. from the Harvard
5 University Graduate School of Business.

6     40.    Defendant Baker is, and at all times relevant herein was, an
7 individual and a resident of Orange County, State of California, and a director of
8 PSI since November 1991. Baker is Chairman of the Special Committee formed in
9 December 2002 to investigate the Krieger shareholder demand. Baker is a member
10 of the Audit Committee and the Nominating/Corporate Governance Committee.
11 Baker is a private investor. Baker is Chairman and CEO of Calloway Golf
12 Company.  From August 1998 through April 2000, he was President and
13 Treasurer of Meditrust Operating Company, a real estate investment trust. From
14 April 1996 to December 1998, Mr. Baker was Chief Executive Officer of Santa
15 Anita Companies, which then operated the Santa Anita Racetrack. From April
16 1993 through May 1995, he was President of Red Robin International, Inc., an
17 operator and franchisor of casual dining restaurants in the United States and
18 Canada. From January 1992 through December 1995, Baker was Chairman and
19 Chief Executive Officer of Carolina Restaurant Enterprises, Inc., a franchisee of
20 Red Robin International, Inc. From 1991 to 1999, he was Chairman of the Board
21 of Coast Newport Properties, a real estate brokerage company. From 1976 to
22 1988, Mr. Baker was a principal shareholder and Chairman and Chief Executive
23 Officer of Del Taco, Inc., an operator and franchisor of fast food restaurants in
24 California. He is a director of La Quinta, Inc., California Pizza Kitchen and Javo
25 Beverage Company.

26     41.    Defendant Harkham is, and at all times relevant herein was, an
27 individual and a resident of Los Angeles County, State of California, and a
28 director of PSI since March 1993. Harkham is a member of the Compensation

1  Committee. Harkham has been the President and Chief Executive Officer of the
2  Jonathan Martin Fashion Group, which specializes in designing, manufacturing
3  and marketing women's clothing, since its organization in 1976. Since 1978,
4  Harkham has been the Chairman of the Board of Harkham Properties, a real estate
5  firm specializing in buying and managing fashion warehouses in Los Angeles.

6      42.    Defendant Staton is, and at all times relevant herein was, an
7  individual and a resident of Cincinnati, State of Ohio or Boca Raton, State of
8  Florida. Staton, Chairman of the Compensation Committee and a member of the
9  Audit Committee and of the Nominating/Corporate Governance Committee,
10  became a director of PSI in March 1999 in connection with the merger of Storage
11  Trust Realty, a real estate investment trust, with PSI. Staton was Chairman of the
12  Board of Trustees of Storage Trust Realty from February 1998 until March 1999
13  and a Trustee of Storage Trust Realty from November 1994 until March 1999. He
14  is President of Walnut Capital Partners, an investment and venture capital
15  company. Staton was the Chief Operating Officer and Executive Vice President of
16  Duke Realty Investments, Inc. from 1993 to 1997 and a director of Duke Realty
17  Investments, Inc. from 1993 until August 1999. From 1981 to 1993, Staton was a
18  principal owner of Duke Associates, the predecessor of Duke Realty Investments,
19  Inc. Prior to joining Duke Associates in 1981, he was a partner and general
20  manager of his own moving company, Gateway Van & Storage, Inc. in St. Louis,
21  Missouri. From 1986 to 1988, Staton served as president of the Greater Cincinnati
22  Chapter of the National Association of Industrial and Office Parks.

23      43.    Defendant Reyes is, and at all times relevant herein was, an
24  individual and a resident of Los Angeles County, State of California. Reyes
25  became PSI's Senior Vice-President and Chief Financial Officer in December
26  1996. Reyes was PSI's corporate controller prior to December 1996.

27      44.    Defendant Goldberg is, and at all times relevant herein was, an
28  individual and a resident of Los Angeles County, State of California. Goldberg is

COMPLAINT
Case No:

1  PSI's Vice President-Senior Counsel and Secretary and has been employed by PSI
2  from some time prior to 1995.

3      45.    Defendant Scott is, and at all times relevant herein was, an individual
4  and a resident of Los Angeles County, State of California.  Scott has been PSI's
5  Vice-President and Tax Counsel since 1996. Prior to 1996 he was affiliated with
6  the HellerEhrman law firm that represented certain entities owned by the Hughes
7  Family Defendants.

8      46.    The true names and capacities of the Defendants sued herein as Does
9  1-100 are presently unknown to Plaintiffs, who therefore sue them by such
10 fictitious names. Plaintiffs will amend this Complaint to allege the true names and
11 capacities of these Defendants when they have been determined.  Each of the
12 fictitiously named Defendants is responsible in some manner for the conduct
13 alleged here.    The Doe Defendants are private individuals, associations,
14 partnerships, corporations or institutions who participated in the wrongful conduct
15 alleged herein in ways in which are unknown to Plaintiffs at this time.  Some or
16 all of the Doe Defendants may be residents of the State of California.

17                    **GENERAL ALLEGATIONS**

18                **History of PSI's Management Structure**

19     47.    PSI was organized and formed in 1980 by affiliates of an entity
20 owned by the Hughes Family Defendants.   Thereafter to the present, PSI has
21 raised several billions of dollars of capital in public offerings of its debt and equity
22 securities.   At its formation, PSI engaged affiliates of an entity owned by the
23 Hughes Family Defendants ("the Hughes Family entities") to conduct its day-to-
24 day operations and operate PSI's mini-warehouse facilities.  These services were
25 provided under the terms of certain Management and Advisory agreements (the
26 M&A Agreements) executed between PSI and the Hughes Family entities.

27     48.    From its formation in 1980 until November 1995, Defendants
28 Hughes, Lenkin, Havner, and Goldman, all long time employees, and/or

                              14                          COMPLAINT
                                                          Case No:

1   shareholders, officers, and directors of the Hughes Family entities, concurrently
2   served in director and/or senior officer positions at PSI. All of the senior officers
3   and directors that the Hughes Family Defendants installed in PSI, therefore, had
4   material conflicts of interests, and divided and conflicting loyalties and financial
5   incentives in any transaction between or among the Hughes Family Defendants or
6   any entity controlled by them.

7       49.   In November 1995, the Hughes Family entities were merged into PSI
8   ("the 1995 Merger") and the Hughes Family Defendants became the majority
9   owner of PSI's voting stock, controlling, at that time over 50.1%, of the voting
10   power in PSI. Due to subsequent issuances of voting common stock, the Hughes
11   Family's ownership of PSI's voting common stock has been reduced and now
12   approximates about 37% of PSI's voting common stock. However, at all times
13   subsequent to 1995, the voting power of the Hughes Family Defendants has
14   permitted them to effectively control the election of PSI's Board.

15       50.   Since its formation in 1980, all of PSI's director candidates have
16   been subject to the selection and approval of the Hughes Family Defendants who
17   have exercised control over PSI's daily activities through the means described
18   above.

19       51.   All of PSI's Management Directors are conflicted and not
20   independent in matters involving the Hughes Family Defendants because of the
21   influence and control exercised by Defendant Hughes over their compensation and
22   continued employment by PSI.

23       52.   Most, if not all, of PSI's Independent Director Defendants, have had
24   long time business and/or personal relationships, some more than 25 years, with
25   Defendant Hughes both prior and subsequent to their selection and nomination to
26   PSI's Board. Some have undisclosed business or personal relationships with the
27   Hughes Family Defendants that raise serious questions concerning their
28

15

COMPLAINT
Case No:

1  independence of mind in exercising their fiduciary duties of care, loyalty, good

2  faith and full disclosure to PSI and its public shareholders.

3      53.   In spite of the circumstances and inherent conflicts involved, the

4  independent directors' review and approval process was the only mechanism in

5  place to assure that the abusive related party transactions were just and reasonable

6  to PSI and its public shareholders.  Independent Director Defendants Abernethy,

7  Angeloff, Baker, Barrack, Evans, Harkham, and Staton have failed in their

8  fiduciary duties of care, loyalty, good faith and full disclosure in connection with

9  the abusive related party transactions.

10      54.   The Hughes Family Defendants, as controlling shareholders and/or

11  directors and officers of PSI, owed fiduciary duties to PSI's 20,000 plus

12  shareholders who, although owners of the majority of PSI's common stock and all

13  two billion plus dollars of PSI's preferred stock, were subject to the control and

14  influence exercised by the Hughes Family Defendants.

15      55.   Management/Director Defendants, Havner, Lenkin and Lotz owed

16  PSI and its public shareholders the fiduciary duties of care, good faith, loyalty and

17  full disclosure in connection with the abusive related party transactions.

18      56.   Management Defendants Reyes, Goldberg, and Scott owed the

19  duties of care, good faith and full disclosure to PSI and its Board in connection

20  with the abusive related party transactions.

21  <center>**The Hughes Family Defendants Created a Climate<br>of Controlling Shareholder Entitlement and Abuse**</center>

22

23      57.   The Hughes Family Defendants developed a sense of controlling

24  shareholder entitlement that is evidenced in all of the abusive related party

25  transactions complained of herein.  The circumstances and the financial terms of

26  the abusive related party transactions are so one sided and blatantly beneficial to

27  the Hughes Family Defendants that the notion of just and reasonable dealings is

28

<center>16</center>

<div align="right">COMPLAINT<br>Case No:</div>

1  mocked when the details are pieced together and an objective independent
2  analysis made.

3      58.    This sense of entitlement was fueled by the operating success of PSI
4  as well as through the Hughes Family Defendants' exercise of their power as
5  officers or directors and the controlling shareholders of PSI.

6      59.    Evidence of this power was cited in remarks concerning the
7  compensation decision-making process at PSI made by Defendant Lenkin during
8  an analysts' conference call in 2004.  In response to an analyst's question, Lenkin
9  remarked as follows:    "Wayne (Defendant Hughes) was the compensation
10 committee" and "Wayne determined compensation adjustments for all senior
11 officers at PSI prior to the appointment of a Compensation Committee in March
12 2003".

13     60.    Senior officers and/directors who were in a position to know and
14 understand the circumstances surrounding the abusive related party transactions,
15 and that they were indeed abusive to PSI and its shareholders to the unjust and
16 unreasonable benefit of the Hughes Family Defendants, apparently ignored any
17 concerns they might have had, meekly and silently accepting the false notion of
18 controlling shareholder entitlement.

19     61.    A statement made by Defendant Lotz concerning PSI's acquisition of
20 PSIC is apropos of the sentiment described above, to wit: "If a deal is good for
21 Wayne (Defendant Hughes) and his family, it's good for PSI".  When reminded
22 that PSI was a public company and majority-owned by other shareholders
23 unrelated to the Hughes Family, Lotz offered no comment.

24     62.    Plaintiffs allege fraudulent and unjust activities, in a number of
25 abusive related party transactions involving PSI, which unreasonably enriched the
26 Hughes Family Defendants.    These fraudulent activities involving PSI were
27 executed by Defendants, and each of them, in the direct action and non-action, by
28 management, directors, and people in position to prevent such fraud, but who

<div align="center">17</div>

COMPLAINT
Case No:

1  elected not to intervene and fraudulently failed to faithfully represent PSI and its
2  shareholders.

3      63.   In total, plaintiffs allege that the abusive related party transactions
4  between the Hughes Family Defendants and PSI collectively defrauded PSI and
5  its public shareholders out of at least several hundred million dollars, and perhaps
6  well over one billion dollars.   In order to facilitate and justify the abusive related
7  party transactions to PSI's shareholders, PSI made a number of false and
8  misleading statements in its public disclosures to shareholders and others. In other
9  cases, the related party transactions were not disclosed to PSI's public
10  shareholders.

11              **The PSIC Scheme Includes False, Misleading or Omitted**
                    **Financial Statement Disclosures**
12
13      64.   The PSIC abusive related party transactions include a continuing
    series of related, alleged, frauds beginning prior to November 1995 and
14
    continuing through at least December 31, 2001. The alleged frauds include:  (1)
15
    the unjust and uncompensated seizure, sometime prior to 1995, of a valuable
16
    corporate opportunity from PSI and its shareholders by the Hughes family;  (2) the
17
    subsequent undisclosed use of valuable PSI resources by PSIC, without
18
    compensation to PSI, to conduct and operate the seized business opportunity, (3)
19
    the benefit of six years (1996 through 2001) of PSIC's profits from the seized
20
    corporate opportunity,  and (4) the subsequent sale of the seized opportunity back
21
    to PSI, on December 31, 2001, at a fraudulent, unjust and unreasonable cost to PSI
22
    and its public shareholders.
23
        65.   Collectively, the PSIC frauds resulted in the unjust and unreasonable
24
    transfer of wealth, estimated to be in the region of $160 million, from PSI and its
25
    public shareholders to the Hughes Family Defendants.
26
        66.   PSIC was formed sometime prior to 1995, and was wholly owned by
27
    the Hughes Family Defendants. The Hughes family, who controlled the activities
28

---

18                                                          COMPLAINT
                                                            Case No:

1   of PSI (then named Storage Equities, Inc. {"SEI"}) through management and
2   advisory agreements with SEI which terminated in November 1995 when SEI and
3   certain entities and properties owned by the Hughes family were merged, caused
4   PSI (1) to exclusively utilize PSIC to provide insurance services to PSI's storage
5   tenants and (2) to provide, without any disclosed compensation, millions of
6   dollars annually of administrative and marketing services on behalf of PSIC.

7       67.   Thereafter, PSIC, controlled entirely by Hughes and the Hughes
8   family, fraudulently, unjustly, and unreasonably reaped extraordinary profits on
9   the seized tenant insurance business of PSI.

10      68.   PSI, through its employees provided most, if not all, of the
11  marketing, selling and administrative services for PSIC's business without any
12  disclosed compensation whatsoever.

13      69.   PSIC's tenant insurance business, conducted for the exclusive benefit
14  of the Hughes family at the expense of PSI's public shareholders, was extremely
15  profitable (particularly since PSI absorbed nearly all of PSIC's operating
16  expenses), providing pre-tax profits of approximately 50% of gross premium
17  revenues, profits that rightfully could have and should have been enjoyed by PSI
18  and all of its shareholders.

19      70.   Finally, on December 31, 2001, the Hughes Family Defendants sold
20  PSIC to PSI at a price far in excess (tens of millions of dollars in excess) of any
21  reasonable fair value based on the relevant economic facts involved. PSIC had a
22  negative net worth of $2.5 million at the closing date. The value, as of December
23  15, 2004, of the 1,138,733 shares of PSI common stock received by the Hughes
24  Family Defendants in the sale plus the dividends received thereon through
25  December 31, 2004, approximates $70 million.  False and misleading statements
26  were made in various PSI public disclosures concerning the sale transaction as
27  more fully discussed below.

28

---

19

71.     The fraudulent operations and transactions were facilitated by: (1) the gross negligence of PSI's independent directors, who approved or otherwise allowed the transactions to occur, and (2) the active cooperation of PSI's operating and financial management who, it will be shown, knowingly made false and misleading public disclosures designed to falsely justify these indefensible transactions.

72.     Public disclosures made by PSI in a Merger Proxy statement dated November 13, 1995, and continuing in various public filings through August 2004, have stated, implied or otherwise suggested that PSI and its public shareholders were precluded by income tax regulations pertaining to Real Estate Investment Trusts ("REITS") from enjoying and receiving the profits generated by the sale of insurance policies to PSI's storage tenants.  Such statements were false and misleading.

73.     In truth, PSI and its public shareholders could have formed a subsidiary to provide insurance to its storage tenants and rightfully enjoyed 95% of the profit without any undue risk.   In a letter dated June 23, 2003 to PSI's independent directors, Krieger set forth the alleged frauds related to the PSI/PSIC transactions and cited the specific false and misleading disclosures made by PSI in the Merger Proxy dated November 13, 1995 (filed with the SEC on October 13, 1995).

74.     Furthermore, it is now alleged that PSI's senior management and independent directors knew in 1995, at the time these disclosures were first made, that they were false and misleading and therefore deliberate.  It is also alleged that PSI's senior management knew these disclosures were false and misleading when they were repeated in proxy statements dated May 10, 2001 and May 9, 2002; in PSI's 2001 and 2002 Annual Reports to Shareholders; in a Form 8-K filed by PSI on June 16, 2003; and, as recently as August 2004, in PSI's Form 10-Q for the quarter ended June 30, 2004.

---

20

COMPLAINT
Case No:

1    75.    Again, in letters dated October 16, 2003 and October 27, 2003 that
2    included an attached Memorandum addressed to certain PSI officers including
3    PSI's internal and external tax counsel and CS&S, counsel to PSI's Special
4    Committee, Douglas Connon, a retired senior tax partner of CPA firm Ernst &
5    Young, pointed out the specific false and misleading statements attributable to PSI
6    senior managers and directors and provided his analysis of the intentional nature
7    of the deceit involved and material potential adverse tax consequences related to
8    the PSIC Transactions.   Plaintiff Krieger was copied on Connon's letters and
9    memorandum.

10    76.    PSI has never disclosed to its public shareholders that since sometime
11    prior to November 1995 and continuing through December 31, 2001, PSI and its
12    employees provided significant administrative, selling and marketing services on
13    behalf of PSIC and that PSI was not reimbursed for the value or even the cost of
14    the services provided to the related party beneficiaries, Hughes and the Hughes
15    Family Defendants.

16    77.    Plaintiffs believe that PSI was required under New York Stock
17    Exchange Rule 312.03, pertaining to shareholder approval of certain related party
18    transactions, to obtain shareholder approval of PSI's acquisition of PSIC. PSI
19    failed to do so. Plaintiff Krieger asserted the alleged failure in several letters to
20    PSI's Board and management.   Defendants have not responded to Krieger nor in
21    any way denied the allegation.

22                        **THE CANADIAN TRANSACTIONS**

23                **PSI Fails To Disclose Unjust And Unreasonable Terms**

24    78.    Hughes and his family have ownership interests in, and operate,
25    approximately 38 self-storage facilities in Canada ("the Canadian properties").
26    Public Storage Canadian Properties is a Canadian publicly limited partnership
27    ("the Canadian Partnership").   Canadian Mini Warehouse Properties Limited
28    ("CMP") is a Nova Scotia company owned by the Hughes family.   CMP is the

                                   21                           COMPLAINT
                                                                Case No:

1   General Partner of the Canadian Partnership. The Hughes family at December 31,
2   2003 owned 50.9% of the Canadian Partnership ownership units.  The Canadian
3   Partnership owns 16 of the 38 Canadian properties.  The other 22 properties are
4   owned by other undisclosed affiliates of the Hughes family.  PSI has no economic
5   interest in the Canadian properties or the Canadian Partnership and no contractual
6   agreement to provide services to the Canadian properties has ever been disclosed
7   by PSI.

8       79.  Since at least November 1995 and continuing through December 31,
9   2003, PSI personnel were engaged in the supervision and the operation of the
10  Canadian properties and provided certain services for the Canadian owners,
11  principally the Hughes Family Defendants ("the Canadian related party
12  transactions").

13      80.  Prior to December 31, 2003, all, or most all, of the Canadian
14  Partnership's officers, none of whom were employees of the Canadian
15  Partnership, were senior officers and employees of PSI who paid their salaries and
16  expenses.  Other PSI personnel were also engaged in the supervision and
17  operation of the Canadian properties and provided certain other administrative
18  services, primarily tax services, with respect to other Hughes family interests.

19      81.  These related party transactions were not publicly disclosed prior to
20  sometime in 2003 and then only disclosed after shareholder and Plaintiff Krieger
21  alleged that these transactions may not be just and reasonable to PSI, and its
22  public shareholders, in a letter dated March 19, 2003 from Krieger to Defendant
23  Abernethy, Chairman of PSI's Audit Committee.

24      82.  In its 2003 Annual Report to Shareholders, PSI reported that it was
25  reimbursed $542,499 in 2003 with respect to services rendered to the Canadian
26  Properties (an average of $14,300 for each of the 38 facilities).  PSI stated that it
27  was reimbursed at its cost for the services rendered, not at fair value.

28

COMPLAINT
Case No:

1       83.   PSI further divulged that: "there have been conflicts of interest in

2   allocating the time of our personnel between our properties, the Canadian

3   properties and other Hughes family interests." The foregoing disclosure was

4   made only after Krieger and his associates identified their concern that there may

5   be transactions between PSI and the Canadian properties that were not just and

6   reasonable to PSI and its shareholders.

7       84.   It was not reported to PSI's shareholders that pursuant to the terms

8   of a management agreement between CMP and the Canadian Partnership, CMP is

9   responsible for providing day-to-day operations of the Canadian Partnership's 16

10   facilities for a fee equal to 6% of the facilities' gross rental revenues. In the years

11   ended December 31, 2001 and 2002 and 2003, the Canadian Partnership paid

12   Hughes family owned CMP C$950,000; C$946,000; and C$919,000 respectively,

13   an average of C$59,000 (US$ 46,000) in each of the three years, for each of the 16

14   facilities. Plaintiffs believe and allege that the services PSI provided were the

15   services CMP was responsible to provide under the terms of the management

16   agreement between CMP and the Canadian Partnership.

17       85.   PSI did not publicly disclose the Canadian Properties related party

18   transactions identified above until well after Krieger questioned the activities

19   mentioned above, such as the use of PSI's personnel and resources without just

20   compensation to PSI, with PSI's management and Audit Committee. PSI was

21   once again dismissive of the concerns and chose to provide no response

22   whatsoever to them. The disclosures that have been made subsequently (in 2003)

23   were made after Krieger's identification of the issues involved.

24       86.   In addition, the disclosures that were made are incomplete and omit

25   financial information that PSI's shareholders are entitled to and that PSI is

26   obligated to provide to them. At this point, PSI's public shareholders cannot

27   accurately determine the aggregate amount of the financial benefit that the Hughes

28

---

<div align="center">23</div>

<div align="right">COMPLAINT<br>Case No:</div>

1  Family Defendants have apparently received at the expense of PSI and its
2  shareholders.

3      87.    However at the least, PSI should have received an average of $46,000
4  per facility, the amount paid by the Canadian Partnership to CMP, not the $14,300
5  per facility it received in 2003.  The difference of $31,700 per facility, or $1.2
6  million per year for the total of 38 properties, applied to the years 1996 through
7  2002, amounts to nearly $10 million of undisclosed benefit to the Hughes family,
8  all at the expense of PSI and its public shareholders.  Plaintiffs, however, allege
9  that PSI received even less reimbursement for those years and may not have
10  received any reimbursement at all.

11      88.    If no reimbursement at all was received, the detriment to PSI's public
12  shareholders would be that much greater, adding millions to a bill of prior
13  fraudulent activities by PSI owners, management, and directors. PSI has not
14  disclosed the amount, if any, paid to PSI by the Canadian properties owners for
15  any year prior to 2003.

16      89.    A remarkable example of the deference that PSI's Board and
17  management extend to the Hughes Family Defendants is found in a Related Party
18  Transactions note included in PSI's unaudited financial statements at September
19  30, 2004 and the quarter then ended.

20      90.    The note discloses, among other things, "The Canadian entities
21  (controlled by the Hughes Family Defendants) claim that the Company owes them
22  CND $653,424, representing the amount charged to them for the development of
23  certain systems they no longer utilize.  This amount has been accrued on the
24  Company's financial statements for the nine months ended  September 30, 2004".
25  How is it that a claim by the Canadian entities controlled by Hughes Family
26  Defendants is so readily acknowledged by PSI and the Board when PSI and its
27  public shareholders have unresolved claims of much larger amounts, which PSI's
28

24

COMPLAINT
Case No:

1  management and Board have not asserted, related to the same Canadian entities,
2  as discussed in this Complaint?

3  ### THE MANAGEMENT AND ADVISORY TRANSACTIONS

4  91.    The M & A Transactions include a series of agreements and
5  amendments thereto between certain entities owned by the Hughes Family
6  Defendants and PSI that were in effect from PSI's formation through the 1995
7  Merger.  The only mechanism available to assure that the terms of the M & A
8  agreements were negotiated at arms' length and were just and reasonable to PSI
9  and its public shareholders was the process of review and approval by the PSI's
10  independent directors.

11  92.    An analysis of certain information contained in the Merger Proxy
12  Statement dated November 13, 1995 indicates that the Hughes Family Defendants
13  were provided with net profits before tax exceeding 80% for the periods shown. If
14  these profit rates were typical of the profits resulting from the M & A transactions
15  that were entered into between PSI and the Hughes Family Defendant-owned
16  entities, the terms of the agreements were unjust and unreasonable to PSI and its
17  public shareholders.

18  93.    The M & A agreements were approved by the independent directors
19  of PSI at the time, including Defendants Abernethy, Angeloff, Baker and
20  Harkham.

21  94.    Plaintiffs allege and believe that the independent directors that
22  approved the M & A Transactions were grossly negligent and breached their
23  fiduciary duties to PSI and its public shareholders and that such conduct and
24  performance mirrors that evidenced in the PSIC and Canadian Transactions.

25  ### DEMAND FUTILITY

26  #### Shareholder Demand Made and Rejected

27  95.    The contract to acquire PSIC was approved by the independent
28  directors of the Company in March 2001 and the transaction closed on December

25

COMPLAINT
Case No:

1 | 31, 2001. PSIC was sold to PSI by the Hughes Family Defendants, who were
2 | officers and/or directors of PSI, and effectively were collectively the controlling
3 | shareholders of PSI.

4 | 96.   On June 6, 2002. PSI shareholder and Plaintiff Krieger made a
5 | written demand, addressed to Defendant Goldberg, to inspect certain documents
6 | related to the acquisition of PSIC by PSI. Krieger asserted that this "related party"
7 | transaction unjustly transferred $25 million to $35 million to the Hughes Family
8 | Defendants, who were officers and/or directors of PSI. Although Krieger's
9 | demand requested five (5) items, Krieger has received (on July 22, 2002) only one
10 | of the items demanded.

11 | 97.   In a series of letters dated July 6, 2002, July 12, 2002, July 24, 2002,
12 | and August 7, 2002, Krieger set forth specific material facts related to the
13 | acquisition of PSIC and asserted that the acquisition terms were unfair and
14 | unreasonable as to PSI and its public shareholders. These letters were addressed to
15 | or copied to Defendants Goldberg, Hughes and Angeloff and Mr. Neal
16 | Brockmeyer, an attorney representing PSI. In each of these letters, Krieger
17 | repeated his demand to inspect the documents specified in his earlier letter dated
18 | June 6, 2002. PSI's Board has refused Krieger's inspection request. PSI's Board
19 | and management denied Krieger an essential shareholder right provided by the
20 | California Corporations Code.

21 | 98.   In a letter to Defendant Hughes dated August 21,2002, Krieger again
22 | set forth the issues, at that time now estimated to involve approximately $67
23 | million, related to the acquisition of PSIC and the profits that the Hughes Family
24 | Defendants received from PSIC prior to its acquisition by PSI that Krieger
25 | claimed were unfair and unreasonable to the company and its public shareholders
26 | and should be disgorged and returned to PSI.

27 | 99.   On September 30, 2002, a draft derivative complaint for damages
28 | ("the Complaint") was delivered to Defendant Lotz, then a senior officer and

COMPLAINT
Case No:

1   director of PSI, and to Mr. Eddie Woods, an attorney representing PSI. The
2   Complaint named as defendants each of PSI's directors and an officer of PSI. The
3   Complaint asked for compensatory damages exceeding $67 million and punitive
4   and exemplary damages to be proven at trial. The Complaint alleged Breach of
5   Fiduciary Duty, Fraud, Unjust Enrichment, and Constructive Fraud against all
6   defendants and Constructive Trust against the Hughes Family Defendants.

7   100. On October 16, 2002 Krieger wrote a three-page letter to Defendant
8   Hughes, with a copy to Defendant Lenkin, PSI's President and a director of PSI.
9   On October 31, 2002, Krieger, wrote a 10-page letter to Defendant Lenkin, with a
10  copy to Defendant Hughes. Defendants Angeloff, Lotz and Goldberg received a
11  copy of each of these letters.

12  101. The October 16 and 31 letters recapped a long list of pertinent
13  questions regarding the PSIC matter that the recipients of Krieger's earlier
14  correspondence had not answered.   Nor had Krieger been provided any
15  information or statements to refute or deny the assertions and allegations made in
16  the correspondence and the draft Complaint. Krieger also asserted in each of the
17  above letters that under Item 4 (k) and Item 6 (d) (iv) of the Underwriting
18  Agreement related to a $150 million public offering of Preferred Stock filed with
19  the SEC in early September 2002, PSI and Defendant Goldberg failed to disclose
20  to the Underwriters the threatened litigation discussed in Krieger's August 7, 2002
21  letter.

22  102. In the October 16th and 31st letters as well as in a November 11, 2002
23  letter addressed to Brockmeyer, an attorney representing PSI, Krieger stated that
24  he had been advised that the issues Krieger had raised in his previous
25  correspondence and in the Complaint should be disclosed to PSI's shareholders in
26  the Form 10-Q to be filed on or before November 14, 2002 and that those
27  individuals signing the Certifications required under the Sarbanes- Oxley Act
28  should be made fully aware of this view.

---

27

COMPLAINT
Case No:

103.   In November 2002, having previously been rebuffed in his repeated attempts to obtain from PSI's management and directors an explanation of the justification of the PSIC Transactions, Krieger made a formal written demand on the Board of Directors that challenged the fairness of the Company's acquisition of PSIC and demanded that the Board recover the profits earned by PSIC from November 1995 through December 2001 and that the entire purchase price paid by the Company for PSIC in excess of PSIC's net assets be returned to the Company. At the time, Krieger estimated these profits at $40 million and this excess at $27.5 million for a total of $67.5 million. At that time, Krieger was unaware of the millions of dollars annually of administrative and marketing services provided to PSIC free of charge by PSI, so these amounts were not included in his demand. The total improperly received by the Hughes family from the PSIC Transactions, including from dividends and an increase in PSI stock value, is now estimated to be approximately $160 million.

104.   After receipt of Krieger's November 2002 Shareholder Demand, a special meeting of PSI's Board was held in early December 2002 and a Special Committee of the Independent Directors was appointed, purportedly to investigate Krieger's demand.

105.   On January 6, 2003, demanding shareholder Krieger and two of his associates met with two members of the Special Committee, Defendant Baker, a PSI director since 1991, the committee chair, and Defendant Staton, a PSI director since 1999 and a committee member, and two Skadden Arps partners who were then representing the Special Committee.

106.   During the meeting, lasting several hours, the issues identified in the Krieger Demand were discussed in considerable detail as well as other independent and unrelated claims of a PSI vender, Community Online Protection Systems, Inc. ("COPS") involving alleged misrepresentations by senior PSI managers and PSI's alleged breach of contract which resulted in substantial

1    monetary damage to COPS and its shareholders. One of the Skadden Arps
2    partners, Eric Waxman stated that the independent directors would be obligated to
3    undertake appropriate action to remedy any violation of PSI policy, including
4    misrepresentations made by senior officers, whether they were in connection with
5    related party transactions or vendor contracts, and the Special Committee
6    members present agreed with Mr. Waxman's statement.

7        107.  The other member of the Special Committee, Defendant Barrack,
8    was not at the meeting, and Krieger and his associates have never met Barrack nor
9    received any communication from him, although he had been copied on various
10   correspondence sent to PSI and its independent directors. Three months later,
11   Barrack elected to not stand for re-election to the Board.  No public explanation
12   has ever been given for Barrack's decision to leave the Board. Barrack was the
13   only independent director who did not vote on the PSIC acquisition transaction in
14   March of 2001.

15       108.  In mid January 2003, Skadden Arps sent a letter to Krieger
16   expressing appreciation for his participation in the January 6th meeting and
17   advised him that the Special Committee should complete its investigation within
18   120 days (May 2003).

19       109.  Three months later, in April 2003, Richard Specter, a partner in a
20   small Orange County law firm, Corbett, Steelman & Specter, advised Krieger and
21   his associates that Skadden Arps no longer represented the Special Committee and
22   that Corbett, Steelman & Specter had been retained to represent the independent
23   directors of PSI and the Special Committee.

24       110.  Subsequently in various letters, Specter conveyed that he represented
25   PSI itself, the independent directors and the Special Committee.  Even after
26   repeated inquiries by Krieger and one of his associates, Specter failed to address
27   the question how representing all of these parties simultaneously in the same
28

---

29                                                          COMPLAINT
                                                            Case No:

1    matter was not a conflict of interest and adverse to the interests of PSI and its
2    public shareholders.

3        111.   In letters dated May 6, 2003 and June 11, 2003, Specter advised
4    Krieger that the Special Committee anticipated completing its investigation by the
5    end of June 2003.

6        112.   PSI has made no disclosures to its shareholders concerning the scope,
7    findings, and actions undertaken as a result of the Special Committee's
8    investigation anticipated to be completed in June 2003, and which at this point has
9    endured for 24 months, 18 months past June 2003.

10       113.   The beneficiaries of the false disclosures and the non-disclosures
11   related to PSIC, its formation, operations, and subsequent sale to PSI, were the
12   Hughes Family Defendants who seized a major corporate business opportunity
13   from PSI and its public shareholders and justified their actions by false and
14   misleading public statements and then, equally unconscionably, sold the seized
15   business back to PSI at an unjust and unreasonable price unsupported by the
16   economic facts that were clearly available and known to the Hughes Family
17   Defendants and the PSI Management/Director Defendants and Management
18   Defendants whom apparently tacitly approved of the deal or stood silently by
19   when the deal was done.

20       114.   The PSI management and Board of Directors have failed to reply to
21   any of Krieger's additional assertions and have not disclosed them in public
22   filings, and have failed to take any effective action on any of them, including the
23   PSIC Transactions that were the subject of Krieger's formal demand.

24       115.   Therefore, it would be futile to make further demands upon the PSI
25   Board of Directors.

26                    **INDEPENDENT AUDITOR ERNST & YOUNG'S ROLE**

27       116.   Although the Krieger Demand was made in November 2002, and the
28   Special Committee was formed in early December 2002, there was no disclosure

                                            30                          COMPLAINT
                                                                        Case No:

1  of these events in PSI's audited 2002 financial statements. E&Y's audit report
2  letter, addressed to The Board of Directors and Shareholders of PSI, accompanied
3  PSI's audited 2002 financial statements and was dated February 21, 2003.  This
4  would indicate that E&Y was not informed of the existence of the Krieger
5  Demand or the formation of the Special Committee and its pending investigation
6  until sometime after the date of its report, or, if informed, ignored PSI's failure to
7  disclose the information to its public shareholders in its 2002 financial statements.
8  In either case, serious questions and implications arise.

9      117.  If E&Y was not informed, why were they not informed?   The
10  minutes of the special meeting of the Board held in December 2002 that
11  authorized the Special Committee should have been provided to the E&Y auditors
12  and the existence of the Krieger Demand and the pending Special Committee
13  investigation should have been disclosed in the legal and client representations
14  letters prepared by Senior PSI management and delivered to E&Y prior to the
15  conclusion of their audit. If the information was withheld from E&Y, a cover-up
16  is suggested.

17      118.  If E&Y was informed, why did they countenance PSI's failure to
18  disclose the information to its shareholders in the 2002 financial statements?
19  Furthermore, why did PSI fail to file a Form 8-K with the SEC disclosing these
20  matters in November and December 2002?  These are also indications of a cover-
21  up.

22      119.  More evidence is found in the fact that sometime well after E&Y
23  concluded its audit, a decision was made by PSI to belatedly disclose the Krieger
24  Demand in **ITEM 3. Legal Proceedings** in PSI's Form 10-K filed on March 31,
25  2003. Plaintiffs believe this disclosure was made reluctantly and only because of
26  the vigilance promised by Krieger in correspondence to PSI.  Plaintiffs believe
27  that PSI made the belated disclosure as a hurried compromise solution worked out
28

---

31

COMPLAINT
Case No:

1  between E & Y and PSI management shortly before the Form 10-K was filed with
2  the SEC.

3      120.  Additional concerns arise because of the absence of disclosures
4  concerning the abusive related party transactions discussed herein. Was E & Y
5  informed of the existence of these sensitive transactions that require appropriate
6  skeptical scrutiny and, if so why did they not insist on full disclosure and satisfy
7  themselves that the transactions were properly accounted for. There has been no
8  disclosure in PSI's financial statements of the free services performed on behalf of
9  PSIC by PSI during the many years that PSIC was owned by the Hughes Family
10  Defendants.  There was also no disclosure in PSI's financial statements of the
11  services performed by PSI for the Canadian Properties for either no charge or a
12  charge at cost, which is less than fair market value, until disclosure was made in
13  2003 after questions were raised by Plaintiff Krieger, even though such services
14  had been performed for many years.  Disclosure of related party transactions such
15  as the services performed by PSI for PSIC and the Canadian Properties is required
16  under generally accepted accounting principles.

17      121.  These issues were pointed out during a January 25, 2004 meeting
18  held with three E & Y partners who were handling E & Y's audit work on PSI. E
19  & Y made no attempt to justify the exclusion of these matters from the financial
20  statements of PSI that they had audited, other than to imply that they had no
21  obligations with respect thereto unless they were material to the financial
22  statements taken as a whole.  Plaintiffs believe, as does the SEC, that any related
23  party transactions at less than arms' length terms, and any related party fraud, are
24  "material".  Plaintiffs do not yet know what actions, if any, were undertaken by E
25  & Y as a result of the January 25, 2004 meeting.

26
27
28

COMPLAINT
Case No:

## PSI'S INDEPENDENT DIRECTORS ARE CONFLICTED

### After More Than 540 Days PSI Has Not Disclosed To PSI's Shareholders Or The Investing Public The Results of The Special Committee's Investigation of The Krieger Demand

122. The Independent Director Defendants, possibly excluding newly elected director Evans, are, as a matter of fact, conflicted, since they approved some or all of the underlying transactions that are the subject of the shareholder demand, as well as for other reasons that have been previously identified in this Complaint. Based upon the information that has been developed as a result of Krieger's investigation and presented to PSI, it has been alleged that the Independent Director Defendants breached their fiduciary duty of good faith, care, loyalty and full disclosure to PSI in approving these transactions which allegedly diverted and usurped material corporate assets and opportunities and allegedly unjustly benefited related parties, the Hughes Family Defendants. The Independent Director Defendants' conduct and lack of performance in investigating Krieger's shareholder demand confirms and compounds their alleged breach of fiduciary duty to PSI's shareholders. More than 540 days have passed since the shareholder demand was made. Krieger and others met with Defendants Baker and Staton, two of the independent directors on the Special Committee appointed to investigate the demand, and Mr. Eric Waxman of Skadden Arps, then the Special Committee's legal counsel, on January 6, 2003. Krieger was informed that the independent directors' review would be completed in 120 days. However, during the past 24 months, there has been no public disclosure of any findings or results of the investigation that PSI's independent directors have purported to undertake. That an investigation would not produce findings and conclusions within 24 months raises unanswered questions about the good faith of the investigation.

123. Why have the findings and conclusions of the investigation been withheld from PSI's 20,000 plus public shareholders who collectively own a

<div align="center">33</div>

<div align="right">COMPLAINT<br>Case No:</div>

1  majority of PSI and have invested several billion dollars of capital? Defendants
2  may point to the Hughes Family Defendants "preemptive" lawsuit filed against
3  PSI as justification for not properly and timely disclosing to the public
4  information concerning the investigation of Krieger's demand. But PSI furnished
5  a modest answer with no counter claims for other matters brought to their
6  attention and PSI has agreed to what is believed to be a non-public arbitration
7  setting that will be out of the view of the public because of a desire to suppress the
8  findings and conclusions reached, if any, of the Special Committee investigation.

9      124.  It is ironic that the Independent Director Defendants have spent more
10  than 24 months on an apparently non-productive, unfinished investigation of the
11  shareholder demand with no publicly reported results. This is significantly more
12  time than they spent in determining to approve the PSIC transactions that are the
13  subject of the demand. The few plausible reasons for this curious situation do not
14  flatter or commend the Independent Director Defendants' motives in conducting
15  their investigation.

16      125.  It is equally unbelievable and ironic that there has been no action
17  announced regarding management personnel at PSI, given the information that has
18  been presented to the independent directors and PSI over the past 24 months
19  concerning allegedly false material statements deliberately made by senior
20  management of PSI to the Independent Director Defendants at the time of the
21  consideration of the 1995 merger between Storage Equities, Inc. ("SEI") and
22  certain entities owned by the Hughes Family Defendants, and probably before as
23  well as thereafter.

24      126.  These alleged false statements by senior management, if indeed they
25  were believed by the Independent Director Defendants, were used to wrongly
26  induce the Independent Director Defendants to accept the continued unjust and
27  unreasonable ownership of PSI's highly profitable tenant insurance business by
28  PSIC and the Hughes Family Defendants. These actions permitted PSIC and the

1    Hughes Family Defendants to divert and usurp PSI's corporate assets and
2    opportunity.

3        127.  The alleged false statements have since been repeated in various PSI
4    SEC filings. They were also repeated in the Hughes Family Defendants' lawsuit
5    against PSI, and, incredibly, PSI's answer to the lawsuit did not bother to refute
6    these allegedly false statements.

7        128.  PSI Board and management have been and are aware of the allegedly
8    false statements, because Krieger pointed out the falsity of these statements to
9    them several times over the past year and a half.  Based on the foregoing, PSI
10   management is apparently willing to continue to make these allegedly untrue
11   statements in their SEC filings, and the independent directors are willing to
12   countenance receiving alleged material deliberate misinformation from PSI
13   officers and management even if the misinformation adversely affects Board
14   decisions and the results are materially detrimental to PSI and its public
15   shareholders.

16       129.  Ernst & Young ("E&Y"), PSI's independent auditors, is thoroughly
17   familiar with the so-called 95-5 subsidiary structure. (This is the ownership
18   structure that Krieger informed PSI's management and Board over the past two
19   years that could have and should have been used to enable PSI, and Storage
20   Equities, Inc. before PSI, to own PSIC all along.) When the 95-5 structure was
21   brought up in the January 25, 2004 meeting referred to earlier with the three
22   partners of E&Y, one of the E & Y partners present said, "Oh, you mean the
23   preferred stock subsidiary structure." The false statements in the SEC filings had
24   been used to justify the ownership of PSIC by the Hughes family, and PSI'S
25   purchase thereof from the Hughes family.  The decisions made by PSI'S Board
26   and management in connection with the above matters will have mounting
27   consequences as ever more scrutiny is applied and the various participants are
28   called to account for and justify their actions in these matters.

---

35                                                    COMPLAINT
                                                     Case No:

130.   No progress report of any kind on the investigation of Krieger's demand has been made to the public shareholders or the investing public during a bull market with large price increases in PSI's stock. The matters involved, including material related party transactions with directors and officers, alleged fraud and collusion, and other corporate governance issues are clearly material matters that should have been timely reported to the public. The undisclosed information concerning the investigation may have denied the public markets information which, had it been disclosed, might well have influenced investors, both buyers and sellers of PSI's stock, as well as the pricing of PSI's recent preferred stock offerings or possibly even PSI's ability to sell the preferred stock on any reasonable terms.

131.   PSI's management and independent directors and their legal advisors have refused repeated requests to meet with Krieger's qualified representatives who reside and work in Southern California. This in spite of earlier assurances by both Skadden Arps and Specter and CS&S (Skadden's replacement as counsel to the Special Committee) to keep Krieger informed of the independent directors' progress and meet with Krieger.

132.   The Special Committee of Independent Directors, chaired by Defendant Baker, was formed to conduct an investigation of the shareholder demand that Krieger made in November 2002 on behalf of PSI and its public shareholders. Skadden Arps, in January 2003, advised Krieger that the Special Committee's investigation would be completed in "120 days". Subsequently, after Skadden Arps mysteriously withdrew, Specter, advised Krieger that the investigation would be completed by the end of May 2003, and later by the end of June 2003, more than 18 months ago!

133.   The Special Committee has not issued either an interim or final report on the scope of its investigation, its findings, the actions undertaken as a consequence of the investigation, or any recommendations made or effected based

COMPLAINT
Case No:

1  upon its investigation. Defendant Baker, who is being well paid by PSI to act as
2  Chairman of the Special Committee, is aware of the obligations and
3  responsibilities that he and the Special Committee have assumed with respect to
4  their duties as committee members in the investigation.  PSI's shareholders will,
5  however, be concerned about how effectively and justly Defendant Baker has
6  discharged his fiduciary duties to PSI's shareholders as Chairman of the Special
7  Committee's investigation; to know why he gave his personal approval of the
8  PSIC transactions; his role in the other related party transactions that have
9  allegedly defrauded PSI's shareholders; and whether or not Mr. Baker has been
10  candid with PSI's shareholders and has any undisclosed relationships with the
11  Hughes Family Defendants.

12      134.  Recently, in a letter dated October 4, 2004, to Specter of CS&S,
13  Krieger expressed his concerns about the lack of communication from the Special
14  Committee with PSI's shareholders and the public. Specter replied to Dr. Krieger
15  in a letter dated October 8, 2004, as follows: "Further, you have inquired as to the
16  status of the Special Committee of independent directors investigation.  When the
17  Special Committee was authorized on December 11, 2002, its directive entailed a
18  review of the fairness of the PSIC acquisition to Public Storage and the ability of
19  Public Storage to have started its own tenant reinsurance business in 1995 without
20  jeopardizing its REIT status.  In June of 2003, the subject litigation was filed (the
21  Hughes lawsuit against PSI).  Those specific issues will now be resolved, as part
22  of the pending litigation, by Retired Chief Justice Malcolm M. Lucas, such that
23  *any further investigation by the Special Committee of those issues has been*
24  *preempted by the lawsuit.*"

25      135.  The preceding highlighted words are mindful of a headline in a Los
26  Angeles law publication that announced the filing of the Hughes family lawsuit as
27  follows:

28      *"PUBLIC STORAGE CHAIRMAN WANTS TO STOP INVESTIGATION"*

COMPLAINT
Case No:

It was obvious even to the reporter that Defendant Hughes and his adult children, Defendants Tamara Hughes and Hughes, Jr., want to stop any legitimate, comprehensive and thorough investigation of the PSIC transactions and other related party transactions that have been identified as abusive to PSI and its public shareholders. It appears that the vehicle to accomplish the desired end is to control a designed closed door, non-public judicial proceeding that is intended to hide relevant facts from the court and PSI's shareholders and in so doing minimize the potential legitimate consequences to the Hughes family and PSI's directors and officers, all of whom are culpable in the matters involved.

132. It is equally clear that the Independent Director Defendants and the Special Committee appointed to conduct an investigation of the PSIC transactions are willing to shirk their responsibilities and fiduciary and ethical duty to PSI and its public shareholders by not disclosing the scope of their investigation, their findings and conclusions, and any actions that they may have undertaken to recover the huge amounts justly and reasonably due to PSI and its public shareholders. They are content to conduct business as usual---follow the directions and lead of the Hughes Family Defendants who remain in control of the situation.

### TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

133. As alleged in detail above, defendants' actively suppressed information about their wrongdoing and deliberately failed to disclose the progress and results of the so-called special investigation. For example, it was not until March 31, 2002 that PSI disclosed that PSIC, which the company acquired, for over $24 million, had a *negative* net worth of $2.5 million. It was not until December 2002, several months after Dr. Krieger first raised his objections and concerns about the PSIC acquisition and subsequently sent his demand to PSI's Board, that the Board initiated any investigation of the PSIC

COMPLAINT
Case No:

1   transaction. Then despite repeated promises that its report would be completed in
2   "90" or "120" days, the Special Committee never reported anything. The Board
3   and the Special Committee took no action following the filing of the Hughes'
4   Family lawsuit against PSI other than to file a 2-page answer that largely admits
5   the allegations of the Hughes complaint. It is clear that the defendants' objective
6   is concealment; despite all the time and information and resources the Board and
7   Special Committee have had, all that has resulted is silence and concealment.
8   Perhaps most shocking, and consistent with their plan of concealment, defendants
9   recently disclosed, on October 8, 2004, that the Special Committee had been
10  disbanded following the June 2003 filing of the Hughes lawsuit. Having made a
11  demand, and been told that a Special Committee was investigating the demand
12  and would report its findings within 90 to 120 days, plaintiff Krieger relied on
13  these representations, awaited the results of the investigation, and deferred taking
14  other action, including the filing of this lawsuit.

15      134. Any applicable statutes of limitations have been tolled or have not
16  run because Defendants knowingly and actively concealed and denied the facts as
17  alleged herein. Defendants had actual or constructive knowledge of the wrongful
18  courses of action alleged here. Moreover defendants represented that a Special
19  Committee had been appointed to investigate the wrongdoing alleged herein, and
20  that said committee would complete its investigation and report its findings within
21  90 to 120 days. Because defendants failed, until October 8, 2004 to apprise
22  plaintiffs of the status of the investigation, plaintiffs have been kept in ignorance
23  of information essential to the pursuit of the claims alleged in this complaint,
24  without any fault or lack of diligence on their part. Plaintiffs did not discover the
25  facts constituting Defendants' wrongful acts until a date within the limitations
26  period governing this action, and promptly exercised due diligence by filing this
27  complaint. Plaintiffs were not at fault for failing to discover Defendants'
28  misconduct sooner, and had no actual or presumptive knowledge of the facts of

1  Defendants' misconduct to put them on inquiry notice. Plaintiffs could not
2  reasonably have discovered Defendants' misrepresentations or material omissions
3  concerning the wrongdoing alleged in this complaint and the Special Committee's
4  investigation of that wrongdoing before October 8, 2004; therefore, their claims
5  accrued on that date, or any applicable statutes of limitations were tolled until that
6  date.

7  135.  Defendants were and are under a continuing duty to disclose the true
8  facts to Plaintiffs concerning the wrongdoing alleged in this complaint and the
9  Special Committee's investigation of that wrongdoing. Because of Defendants'
10  concealment of material information concerning the wrongdoing and the
11  investigation, Defendants are estopped from relying on any statute of limitations
12  defense, as the defendants' conduct, relied on by the plaintiffs, induced the
13  plaintiff to postpone filing the action until after October 8, 2004.

<center>**COUNT I**</center>

<center>**Against All Individual Defendants For Breach Of Fiduciary Duties In
Connection With The PSIC Transactions, The Canadian Transactions, and
The Management & Advisory Fee Transactions**</center>

17  136.  Plaintiffs incorporate by reference all preceding and subsequent
18  paragraphs as if set forth fully herein.

19  137.  As alleged in detail herein, the Individual Defendants were officers or
20  directors of PSI, and as such owed duties of care, good faith, loyalty and full
21  disclosure and inherent fairness to PSI and its shareholders.

22  138.  The Individual Defendants breached their fiduciary duties to PSI and
23  its shareholders as a consequence of their collective and individual participation in
24  the circumstances and process leading to the perpetration of the PSIC
25  Transactions.

26  139.  Individual Defendants knew, or were in a position to reasonably
27  determine, using such care, including reasonable inquiry, as an ordinarily prudent
28  person in a like position would use under similar circumstances, that the terms of

<center>40</center>

<div align="right">COMPLAINT<br>Case No:</div>

1  the PSIC acquisition were not just and reasonable as to PSI and its public
2  shareholders at the time the acquisition transaction was approved, and that taking
3  into account the significant and material limiting qualifications set forth therein,
4  the fairness opinion by Duff & Phelps could not and should not be relied upon to
5  support that the transaction was just and reasonable as to PSI and its shareholders.

6     140.  Individual Defendants knew that PSIC had no business other than the
7  business that PSI provided it and therefore had little or no value to PSI or any
8  other party absent the PSI business. Furthermore, they knew or should have
9  known that, at December 31, 2001, PSIC had liabilities that exceeded its net assets
10  by $2.5 million and possessed no other significant asset value. In spite of these
11  facts, the Individual Defendants sponsored, supported, approved or did not
12  oppose, the payment by PSI of $24.5 million to the Hughes Family Defendants, in
13  the form of 1,138,733 shares of PSI's common stock (currently worth
14  approximately $70 million including the dividends paid thereon subsequent to
15  December 31, 2001).

16     141.  Director Defendants knew that the PSIC Transactions, Canadian
17  Transactions and M & A Transactions involved extreme conflicts of interests and,
18  therefore, required an extreme level of due diligence and skeptical scrutiny of the
19  transactions by the non-seller Defendant Directors in order to assure that the
20  transactions were just and reasonable as to PSI and its public shareholders.
21  Director Defendants woefully failed to meet this standard in breach of their
22  fiduciary duties as set forth in the California Corporations Code, particularly
23  Sections 309 and 310 thereto.

24     142.  Individual Defendants were aware that PSI, since sometime prior to
25  November 1995, was passing on to PSIC all of its reinsurance business, which
26  Plaintiffs are informed and believe, and thereon allege, produced significant
27  amounts of profits, estimated to be in the region of $40 million over the six years
28  ended December 31, 2001, or perhaps more, to the owners of PSIC, the Hughes

41     COMPLAINT
Case No:

1   Family Defendants. Furthermore, Plaintiffs are informed and believe, and thereon
2   allege, that PSI received no fair consideration for the profitable business that it
3   passed to PSIC nor for the marketing and administrative services related to the
4   insurance business that were rendered by PSI and its employees. These profits and
5   un-reimbursed costs were tantamount to undisclosed dividends that were received
6   by the Hughes Family Defendants, insiders who were in a position to control and
7   influence PSI's actions to the detriment of all other shareholders.

8   143.   Had PSI justly and reasonably retained the financial benefits of the
9   valuable insurance business opportunity seized by the Hughes Family Defendants
10  sometime before 1995, the profits reported by PSI (then SEI) in 1995 would have
11  been correspondingly increased thereby, and, in turn, served to reduce the number
12  of shares of PSI stock received by the Hughes Family Defendants in the
13  November 1995 Merger. While the amount of such profits for 1995 were not
14  publicly disclosed, Plaintiffs estimate the value of the excess stock received by the
15  Hughes Family Defendants in the November 1995 Merger, plus the cumulative
16  dividends received thereon to date, approximate $50 million.

17  144.   Individual Defendants and the Independent Director Defendants who
18  reputedly approved the transactions were aware that PSI was rendering services to
19  the Canadian entities owned by the Hughes Family Defendants and that PSI was
20  not reimbursed for the fair value of such services from 1996 through 2004.
21  Individual Defendants know they have breached their fiduciary duty to PSI and its
22  public shareholders and that PSI as a result. Individual Defendants know that PSI
23  has not disclosed the true facts involving the Canadian Transaction to PSI's public
24  shareholders and the investing public.

25  145.   Defendant Evans has unique and conflicted responsibilities in
26  connection with the Canadian Transactions due to his positions with and fiduciary
27  duties to the Canadian entities owned, in whole or part, by the Hughes Family
28  Defendants and his fiduciary duties to PSI and its public shareholders. He appears

42                                                    COMPLAINT
                                                      Case No:

1 | to have had fiduciary duties with respect to the Canadian public partnership that is
2 | managed under an agreement with CMPH (owned by the Hughes Family
3 | Defendants) of which he serves as a director. The circumstances of the Canadian
4 | M & A agreements appear to have similarities with the M & A Transactions
5 | discussed in this Complaint.

6 | 146. Defendants Abernethy, Angeloff, Baker and Harkham approved the
7 | M & A Transactions that allowed the Hughes Family Defendants to reap unjust
8 | and unreasonable profits therefrom at the expense of PSI and its public
9 | shareholders, thus breaching their fiduciary duties of care, good faith, loyalty and
10 | full disclosure. The amount of such grossly unjust and unreasonable profits
11 | resulting from these material related party transactions were wrongly never
12 | disclosed to PSI's public shareholders nor apparently considered by the
13 | independent directors who approved them. The other Individual Defendants who
14 | were in a position to know the amounts of profit involved breached their fiduciary
15 | duties of care, good faith, loyalty and full disclosure to PSI and its public
16 | shareholders as well.

17 | 147. As a direct and proximate result of the Individual Defendants'
18 | foregoing breaches of fiduciary duties, PSI has been injured and sustained
19 | damages, including, but not limited to, an amount to be proven at trial, which upon
20 | information and belief plaintiff alleges currently substantially exceeds One
21 | Hundred Seventy Million Dollars ($170 million).

22 | 148. The aforementioned breaches of fiduciary duty were done
23 | intentionally, fraudulently, and with a conscious disregard of the rights of PSI and
24 | its shareholders, entitling them to punitive and exemplary damages in an amount
25 | to be proven at trial.

26
27
28

43

COMPLAINT
Case No:

## COUNT II

### Against All Individual Defendants For Waste Of Corporate Assets

149. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

150. As alleged in detail herein, each of the Individual Defendants had a duty to avoid wasting the Company's assets. Each of the Individual Defendants affirmatively participated, to one extent or another, in the process that permitted the abusive related party transactions discussed in this Complaint to occur, unjustly and unreasonably transferring valuable PSI assets from PSI and its public shareholders to the Hughes Family Defendants without receiving fair consideration from the Hughes Family Defendants, which constituted a waste of corporate assets.

151. As a direct and proximate result of the Individual Defendants' waste of corporate assets as alleged herein, PSI has been injured and sustained damages, including, but not limited to, an amount to be proven at trial, which upon information and belief plaintiff alleges substantially exceeds One Hundred Seventy Million Dollars ($170 million).

152. The aforementioned waste of corporate assets was done intentionally, fraudulently, and with a conscious disregard of the rights of PSI and its shareholders, entitling them to punitive and exemplary damages in an amount to be proven at trial.

## COUNT III

### Against The Hughes Family Defendants For Violation Of California Corporations Code Section 25402

153. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

154. At the time of the stock acquisitions related to the PSIC Transactions and the M & A Transactions set forth in this Complaint, the Hughes Family

---

44

1  Defendants knew the material adverse non-public information described in this
2  Complaint. The information was proprietary non-public information concerning
3  the Company's financial condition and prospects.   The information was a
4  proprietary asset belonging to PSI, which the Hughes Family Defendants used for
5  the benefit of themselves when they acquired PSI common stock with PSIC and
6  the M & A Transactions at a price lower than they could have obtained had PSI
7  and the market been aware, as they were, of the true state of the Company's
8  finances and prospects.

9      155. By acquiring shares of PSI common stock while in possession of
10  material adverse non-public information regarding the Company, the Hughes
11  Family Defendants violated California Corporations Code §25402, and are
12  therefore liable to the Company pursuant to California Corporations Code
13  §25502.5(a) for damages in an amount equal to three (3) times the difference
14  between the price at which they acquired PSI shares and the market value at which
15  such shares would have purchased had the material non-public adverse
16  information known to them been publicly disseminated.

17                              **COUNT IV**
18  **Against The Hughes Family Defendants for Breach Of Fiduciary Duties For
    Insider Acquisition And Misappropriation of Information**
19
20      156. Plaintiffs incorporate by reference all preceding and subsequent
    paragraphs as if fully set forth herein.
21
22      157. At the time of the stock acquisition set forth in ¶ 17,74,and 146 the
23  Hughes Family Defendants knew the material adverse non-public information
    described therein. The information described therein was non-public information
24  concerning the Company's financial condition and prospects. It was a proprietary
25  asset belonging to the Company, which the Hughes Family Defendants misused
26  for their benefit when they acquired PSI common stock at prices lower than they
27  could have obtained had the market been aware, as they were, of the true state of
28

---
                              45                    COMPLAINT
                                                    Case No:

1  the Company's finances and prospects. At the time of the stock acquisition, the
2  Hughes Family Defendants knew, or reasonably should have known, that PSIC
3  was worth little or nothing to the company, as the company could start its own
4  tenant reinsurance for a small fraction of the PSIC purchase price, and could
5  operate a tenant reinsurance at no additional cost as PSI was – for PSIC's entire
6  existence -- already providing essentially all the operating expenses for PSIC. The
7  Hughes Family Defendants also knew, or reasonably should have known, that the
8  profits generated by the seized insurance business opportunity and the excessive
9  profits generated by the unjust and unreasonable M & A Transactions unjustly and
10 unreasonably served to significantly increase the shares they received in PS's
11 merger with SEI.

12     158.  Thus the Hughes Family Defendants knew they were acquiring PSI
13 common stock at price that was substantially below market and below what the
14 Hughes Family Defendants could have acquired the stock had the public known
15 the truth about the PSIC Transactions and the M & A Transactions. The Hughes
16 Family Defendants' purchase of PSI common stock while in possession and
17 control of this material adverse non-public information was a breach of their
18 fiduciary duties of loyalty and good faith.

19     159.  Because the Hughes Family Defendants' misuse of the Company's
20 proprietary information constitutes a breach of their fiduciary duties, the Company
21 is entitled to the imposition of a constructive trust on any profits obtained thereby.

22                              **COUNT V**

23  **Against The Director Defendants For Aiding And Abetting The Hughes
     Family Defendants' Breaches of Fiduciary Duties**
24

25     160.  Plaintiffs incorporate by reference all preceding and subsequent
    paragraphs as if set forth fully herein.
26

27     161.  The Director Defendants knowingly aided and abetted the Hughes
28 Family Defendants' aforementioned breaches of fiduciary duties by, among other

---

46                                    COMPLAINT
                                      Case No:

1  things, affirmatively approving and actively participating in the improper PSIC
2  acquisition as alleged herein.

3      162.  As a direct and proximate result of the Director Defendants' conduct,
4  PSI has suffered damages, as alleged herein.

5                                    **COUNT VI**

6  **Against All Individual Defendants For Breach of Fiduciary Duties for**
   **Dissemination Of Misleading And Inaccurate Information**
7
8      163.  Plaintiffs incorporate by reference all preceding and subsequent
9  paragraphs as if set forth fully herein.

10     164.  Plaintiffs allege in detail herein, each of the Individual Defendants
11  had a duty to ensure that PSI disseminated accurate information to its shareholders
12  and the market. Each of the Individual Defendants breached their duties of candor,
13  loyalty, good faith, and full disclosure by causing or allowing the Company to
14  disseminate materially misleading and inaccurate and/or incomplete information
15  through public statements, as alleged herein.

16     165.  As a direct and proximate result of the Individual Defendants'
17  foregoing breaches of fiduciary duties, PSI has suffered damages, including, but
18  not limited to, exposure to liability for violations of federal law, including but not
19  limited to, the provisions of the Sarbanes-Oxley Act of 2002.

20                                   **COUNT VII**

21  **Against All Individual Defendants For Breach of Fiduciary Duties for Failure**
    **To Pursue Claims Against the Hughes Family Defendants**
22
23     166.  Plaintiffs incorporate by reference all preceding and subsequent
    paragraphs as if set forth fully herein.

24     167.  As alleged in detail herein, each of the Individual Defendants had a
25  duty to act in the best interests of PSI and all its shareholders, and to refrain from
26  benefiting themselves at the expense of the Company. As alleged in detail herein,
27  the Individual Defendants have refused to pursue the Company's materially
28  valuable claims against the Hughes Family Defendants, and instead have chosen

1  to favor the interests of Hughes Family Defendants over those of the Company

2  and its shareholders. This conduct, which could not have been an exercise of

3  good faith business judgment, is in breach of the Individual Defendants' fiduciary

4  duties of care, loyalty and good faith.

5  168. As a direct and proximate result of the Individual Defendants'

6  foregoing breaches of fiduciary duties, PSI has suffered damages, as alleged

7  herein.

8  ## COUNT VIII

9  **Breach of Fiduciary Duty and/or Aiding and Abetting Breach of Fiduciary Duty Against All Individual Defendants**

10

11  169. Plaintiffs incorporate by reference all preceding and subsequent

12  paragraphs as if set forth herein.

13  170. Each of the Individual Defendants knowingly, willfully, intentionally

14  or recklessly permitted the actions taken to transfer PSI's corporate opportunities

15  and assets to, and the use of corporate resources by, the Hughes Family

16  Defendants in violation of applicable rules, regulations and industry standards,

17  thus misappropriating PSI's assets, opportunities and resources for the benefit of

18  the Hughes Family Defendants, and falsifying PSI's SEC filings and

19  communications to shareholders and investors. These defendants knew that if they

20  disclosed the true facts concerning their wrongful acts, they would jeopardize their

21  control over the companies, the remuneration they received and their positions of

22  power, prestige and profit at PSI, while exposing themselves to suits and

23  investigations and the risks of civil liability, criminal prosecution and regulatory

24  action.

25  171. As officers and directors of a publicly held company, the Individual

26  Defendants had a duty to disseminate accurate and truthful information with

27  regard to PSI's operations, financial condition, assets and earnings to their

28  shareholders, as well as the financial markets. The Individual Defendants did not

1  do this. Instead they concealed their wrongdoing and disseminated false and
2  misleading statements and reports about PSI to the PSI shareholders.

3      172. The Individual Defendants, as officers and directors of PSI,
4  participated in the acts of fraud and mismanagement alleged herein - knowingly,
5  willfully, intentionally or recklessly. They thereby breached their fiduciary duties
6  of care, candor, loyalty and full disclosure to PSI and its shareholders. They have
7  thus exposed PSI to liability for violations of federal law, including the Sarbanes-
8  Oxley Act.

9      173. The Individual Defendants also each owed a duty to PSI to test,
10  oversee and monitor their systems of internal disclosure, financial and accounting
11  controls, governance procedures and disclosure procedures and to ensure that they
12  were functioning in an effective manner and in compliance with, inter alia, the
13  Sarbanes-Oxley Act.

14      174. Pursuant to Sarbanes-Oxley, and as a result of the misconduct alleged
15  herein, the Defendants Hughes, Havner, Lenkin, and Reyes who served as CEO,
16  President or CFO of PSI, respectively, and executed certifications pursuant to 18
17  U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley
18  Act of 2002 are required to reimburse PSI for the bonuses and other incentive-
19  based and equity-based compensation received by them from PSI for 2002-2004.

20      175. Independent of Sarbanes-Oxley, such defendants should be required
21  to disgorge any and all gains unjustly obtained at the expense of PSI and its
22  shareholders by way of their fraudulent conduct and breach of their fiduciary
23  duties.  The conduct outlined herein was not due to an honest error of judgment,
24  but rather to the defendants' bad faith and was done knowingly, willfully,
25  intentionally or recklessly. By reason of the foregoing, PSI has been damaged.

26

27

28

COMPLAINT
Case No:

1

2

## COUNT IX

## Abuse of Control Against All Individual Defendants

3      176.   Plaintiffs incorporate by reference all preceding and subsequent
4   paragraphs as if set forth herein.

5      177.   For the purpose of maintaining and entrenching themselves in their
6   positions of power, prestige and profit at, and control over, PSI, and to continue to
7   receive the substantial benefits, salaries and emoluments associated with their
8   positions, the Individual Defendants employed the alleged scheme. As a part of
9   this scheme, these Individual Defendants actively made and/or participated in the
10  making of, or aided and abetted the making or the concealment of, numerous
11  omissions and misrepresentations of facts regarding PSI to shareholders. These
12  representations and statements were untrue and the Individual Defendants did not
13  believe them to be true when made, and knowingly, willfully and/or intentionally
14  made them without regard to their truthfulness or aided and abetted the making of
15  said representations.

16     178.   The Individual Defendants' conduct constituted an abuse of their
17  ability to control and influence PSI. By reason of the foregoing, PSI has been
18  damaged.

19

## COUNT X

20

## Gross Mismanagement Against All Individual Defendants

21     179.   Plaintiffs incorporate by reference all preceding and subsequent
22  paragraphs as if set forth herein.

23     180.   The Individual Defendants had a duty to PSI and its shareholders to
24  prudently supervise, manage and control the operations, business and internal
25  financial accounting and disclosure controls of PSI.

26     181.   These Individual Defendants by their actions and by engaging in the
27  fraud described herein, abandoned and abdicated their responsibilities and duties
28  with regard to prudently managing the businesses of PSI in a manner consistent

50                                              COMPLAINT
                                                Case No:

1 with the duties imposed upon them by law, including Sarbanes-Oxley. By
2 committing and concealing this fraud, the Individual Defendants breached their
3 duties of due care, diligence and candor in the management and administration of
4 PSI's affairs and in the use and preservation of PSI's assets.

5      182. The Individual Defendants knowingly, willfully, intentionally or
6 recklessly permitted the actions taken to transfer PSI's corporate opportunities and
7 assets to, and the use of corporate resources by, the Hughes Family Defendants in
8 violation of applicable rules, regulations and industry standards, thus
9 misappropriating PSI's assets, opportunities and resources for the benefit of the
10 Hughes Family Defendants, and falsifying PSI's SEC filings and communications
11 to shareholders and investors. During the course of the discharge of their duties,
12 these defendants knew or recklessly disregarded the unreasonable risks and losses
13 associated with their fraud and misconduct, yet these defendants caused PSI to
14 engage in this scheme which they knew had an unreasonable risk of damage to
15 PSI, thus breaching their duties to PSI. As a result, the Individual Defendants
16 grossly mismanaged PSI.

17      183. By reason of the foregoing, PSI has been damaged.

18
19 <div align="center">**COUNT XI**</div>

20 <div align="center">**Constructive Fraud Against All Individual Defendants**</div>

21      184. Plaintiffs incorporate by reference all preceding and subsequent
22 paragraphs as if set forth fully herein.

23      185. As corporate fiduciaries, the Individual Defendants owed to PSI and
24 its shareholders a duty of candor and full accurate disclosure regarding the true
25 state of the PSI's business and its assets and its conduct with regard thereto.

26      186. The Hughes Family Defendants represented that the purchase price of
27 $24,538,000 paid by the Corporation to them in the PSIC acquisition transaction
28 was fair and reasonable as to the Corporation. The Hughes Family Defendants

<div align="center">51</div>

<div align="right">COMPLAINT
Case No:</div>

1  knew this representation was false and that PSIC's value was entirely attributable
2  to the profits generated by the reinsurance business that the Corporation passed on
3  to PSIC.

4      187.  Furthermore the Hughes Family Defendants knew that the changes in
5  the tax laws effective January 1, 2001 would eliminate the unfounded notion that
6  the Corporation previously was effectively prevented from conducting a
7  reinsurance operation and, assuming the Corporation determined that it was in the
8  best interests of its shareholders to commence such an operation, PSIC would
9  have little if any value beyond the value of its net assets to anyone including the
10  Corporation.

11      188.  Defendants allowed, supported, and are responsible for a series of
12  public disclosures concerning the inability of the Corporation to engage in the
13  reinsurance business prior to January 1, 2001 and its acquisition of PSIC which
14  were incomplete, untimely, or not factually correct, and, served to confuse,
15  misinform and mislead shareholders and potential investors.

16      189.  Defendants were aware that the Corporation was passing on to PSIC
17  all of its reinsurance business between December 1, 1995 and December 31, 2001,
18  which Plaintiffs are informed and believe, and thereon allege, produced significant
19  amounts of profits, estimated to be up to Forty Million Dollars ($40,000,000) to
20  the owners of PSIC, the Hughes Family Defendants. Furthermore, Plaintiffs are
21  informed and believe, and thereon allege, that the Corporation received no fair
22  consideration for the profitable business that it passed to PSIC nor for the
23  marketing and administrative services related to the insurance that were rendered
24  by the Corporation and its employees. These profits were tantamount to
25  undisclosed dividends that were received by insiders, the Hughes Family
26  Defendants, who were in a position to control and influence the Corporation's
27  actions, to the detriment of all other shareholders.

28

---

52

1      190.  As a result of the conduct complained of, the Individual Defendants

2  made, or aided and abetted the making of, numerous misrepresentations to and/or

3  concealed material facts from PSI shareholders despite their duties to, inter alia,

4  disclose the true facts regarding their stewardship of PSI. Thus they have

5  committed constructive fraud and violated their duty of candor.

6      191.  By reason of the foregoing, PSI has been damaged.

7  **COUNT XII**

8  **Unjust Enrichment Against All Individual Defendants**

9      192.  Plaintiffs incorporate by reference all preceding and subsequent

10  paragraphs as if set forth herein.

11      193.  As a result of the conduct described above, all the Individual

12  Defendants will be and have been unjustly enriched at the expense of PSI, in the

13  form of unjustified salaries, benefits, bonuses, stock options and grants and other

14  emoluments of office.

15      194.  By reason of their conduct described above, the Hughes Family

16  Defendants have been unjustly enriched in an amount to be proven at trial, upon

17  information and belief substantially exceeding One Hundred Seventy Million

18  ($170 million).

19      195.  Certain of the Individual Defendants sold PSI stock for a profit

20  during the period of deception, misusing confidential non-public corporate

21  information. These defendants should be required to disgorge the gains which they

22  have and/or will otherwise unjustly obtain.

23      196.  All the payments and benefits provided to these defendants were at

24  the expense of PSI. PSI received no benefit from these payments. PSI was

25  damaged by such payments made at the expense of PSI.

26

27

28

<center>53</center>

<div align="right">COMPLAINT<br/>Case No:</div>

1

**PRAYER FOR RELIEF**

2

WHEREFORE, plaintiffs demand judgment as follows:

3    A.    Awarding money damages against all defendants, jointly and
4  severally, for all losses and damages suffered as a result of the acts and
5  transactions complained of herein, together with pre-judgment interest, molded in a
6  fashion to ensure defendants do not participate therein or benefit thereby;

7    B.    Directing all defendants to account for all damages caused by them
8  and all profits and special benefits and unjust enrichment they have obtained as a
9  result of their unlawful conduct, including all salaries, bonuses, fees stock awards,
10  options and common stock sale proceeds and imposing a constructive trust
11  thereon;

12    C.    Imposing a voting trust upon the shares of PSI held directly or
13  indirectly by the Hughes Family Defendants.

14    D.    Directing PSI to take all necessary actions to reform and improve
15  their corporate governance and internal control procedures to comply with
16  Sarbanes-Oxley, including, but not limited to, putting forward for a shareholder
17  vote resolutions for amendments to the company's By-Laws or Articles of
18  Incorporation and taking such other action as may be necessary to place before
19  shareholders for a vote the following Corporate Governance Policies:

20          (i.)    a proposal to simplify the corporate structure, strengthen the
21  Board's supervision of operations and develop and implement procedures for
22  greater shareholder input into the policies and guidelines of the Board;

23          (ii.)    a provision to permit the public shareholders of PSI, to
24  nominate at least three candidates for election to the board of directors;

25          (iii.)    appropriately test and then strengthen the internal audit and
26  control functions;

27          (iv.)    control and limit insider stock selling; and

28          (v.)    reform executive compensation.

54                                                          COMPLAINT
                                                            Case No:

1  E.  Awarding punitive damages;

2  F.  Awarding costs and disbursements of this action, including

3  reasonable attorneys', accountants', and experts' fees; and

4  G.  Granting such other and further relief as this Court may deem just

5  and proper.

6  **JURY DEMAND**

7  Plaintiffs demand a trial by jury.

8

9  DATED: 12/29 , 2004  Respectfully submitted,

10

11  GERGOSIAN & GRALEWSKI LLP
EDWARD M. GERGOSIAN
ROBERT J. GRALEWSKI, JR.

12

13

14  EDWARD M. GERGOSIAN

15  550 West C Street, Suite 1600
San Diego, CA 92101

16

17  Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

55  COMPLAINT
Case No: